COOLEY LLP
ALI M. M. MOJDEHI (123846)
(AMOJDEHI@COOLEY.COM)
JANET D. GERTZ (231172)
(JGERTZ@COOLEY.COM)
BRIAN W. BYUN (264506)
(BBYUN@COOLEY.COM)
4401 Eastgate Mall
San Diego, CA 92121-1909
Telephone:    (858) 550-6000
Facsimile:    (858) 550-6420

Attorneys for Creditor
The Minority Voting Trust, David F. Veyna,
Carmen Veyna, and Anna M. Zankel, Trustees

## UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA

## SAN FERNANDO VALLEY DIVISION

| | |
|---|---|
| In re<br><br>ORANGE COUNTY NURSERY, INC., a California corporation,<br><br>        Debtor, | Case No. 1:09-bk-22100-GM<br><br>Chapter: 11<br><br>**MOTION OF THE MINORITY VOTING TRUST FOR ORDER (1) REQUIRING DEBTOR TO MODIFY FOURTH AMENDED PLAN OF REORGANIZATION TO CONFORM TO DISTRICT COURT ORDER OR, IN THE ALTERNATIVE, VACATING CONFIRMATION ORDER AND DEBTOR'S FOURTH AMENDED PLAN OF REORGANIZATION, IN PART, AND CONFIRMING PLAN PROPOSED BY MINORITY; (2) VACATING CLAIM DETERMINATION ORDER; AND (3) VACATING ATTORNEY FEE ORDER; MEMORANDUM OF POINTS AND AUTHORITIES**<br><br>**HEARING:**<br>**DATE:    MAY 29, 2012**<br>**TIME:    10:00 A.M.**<br>**PLACE:    U.S. BANKRUPTCY COURT**<br>            **COURTROOM 303**<br>            **21041 BURBANK BLVD.**<br>            **WOODLAND HILLS, CA 91367** |

COOLEY LLP
ATTORNEYS AT LAW
SAN DIEGO

750090 v9/SD

# Table of Contents

**Page**

I.      INTRODUCTION ...................................................................................................... 2

II.     FACTUAL AND PROCEDURAL BACKGROUND .............................................. 4

    A.      Pre-Petition Events ...................................................................................... 4

    B.      Post-Petition Events .................................................................................... 6

        1.      The Debtor's Schedules ................................................................... 6

        2.      The Minority's Proof of Claim ....................................................... 6

        3.      The Claim Determination Order ...................................................... 6

        4.      The Confirmation Order .................................................................. 7

        5.      The Minority's Appeal of the Confirmation Order and Receipt of a
            Stay of the Confirmation Order ...................................................... 9

        6.      The Attorney Fee Order ................................................................ 10

        7.      The District Court Order ............................................................... 10

        8.      The First Motion to Enforce the District Court Order .................. 11

        9.      The Ninth Circuit Appeal ............................................................. 12

III.    AUTHORITIES AND ARGUMENT ................................................................... 13

    A.      Law of the Case Doctrine .......................................................................... 13

    B.      The Mandate Rule ...................................................................................... 14

    C.      The District Court Order ............................................................................ 17

    D.      Valuing the Section 2000 Claim ............................................................... 17

        1.      Unsecured Claims Are Valued as of the Petition Date ................. 18

        2.      The Value of the Section 2000 Claim Is in Excess of $2.5 Million .......... 19

    E.      Valuing the Attorney Fee Claim ............................................................... 20

    F.      The Mandate Rule and Law of the Case Doctrine Necessitate a Tailored
        Approach to Addressing the Deficiencies in the Plan ............................... 21

        1.      Classes 4 and Above, 5A and 6 (Not Impacted) .......................... 21

        2.      Class 5B (Directly Impacted) ....................................................... 22

        3.      Class 7 (Directly Impacted, but Deemed to Reject) ..................... 22

    G.      Changes to the Plan's Treatment of Classes 5B and 7 Are Mandated by the
        Bankruptcy Code, the District Court Order, and the Plan Itself .............. 23

        1.      All Old Equity Must Be Eliminated, Where the Present Value of the
            Section 2000 Claim Is Not Paid in Full ....................................... 23

        2.      New Voting Shares and Control of OCN Must Be Ceded to Those
            Persons Holding a True Economic Interest in OCN ...................... 24

IV.     CONCLUSION ..................................................................................................... 27

COOLEY LLP
ATTORNEYS AT LAW
SAN DIEGO

1

# Table of Authorities

2

**Page(s)**

3

CASES

4

*In re Ahead Communications Systems,*

5
    395 B.R. 512 (D. Conn. 2008) ................................................................................. 26

6

*Am. Title Ins. Co. v. Lacelaw Corp.,*
    861 F.2d 224 (9th Cir. 1988) ................................................................................. 20

7

*Arizona v. California,*

8
    460 U.S. 605 (1983) ............................................................................................. 13

9

*In re Bohrer,*

10
    266 B.R. 200 (Bankr. N.D. Cal. 2001) ................................................................. 19

11

*In re Brints Cotton Marketing, Inc.,*
    737 F.2d 1338 (5th Cir. 1984) ............................................................................... 19

12

*Dep't of Housing & Urban Dev. v. Westwood Plaza Apartments, Ltd. (In re Westwood*

13
    *Plaza Apartments, Ltd.),*
    192 B.R. 693 (E.D. Tex. 1996) ............................................................................. 16

14

*Everett v. Perez (In re Perez),*

15
    30 F.3d 1209 (9th Cir. 1993) ..................................................................... 16, 18, 23

16

*In re Fed.-Mogul Global Inc.,*

17
    330 B.R. 133 (Bankr. D. Del. 2005) ..................................................................... 19

18

*First Brandon Nat'l Bank v. Kerwin-White,*
    109 B.R. 626 (D. Vt. 1990) ................................................................................... 17

19

*In the Matter of Gervich,*

20
    570 F.2d 247 (8th Cir. 1978) ................................................................................. 19

21

*In re Global Power Equip. Group Inc.,*

22
    2008 Bankr. LEXIS 455 (Bankr. D. Del. Feb. 14, 2008) ..................................... 18

23

*Hansen & Rowland v. C.F. Lytle Co.,*
    167 F.2d 998 (9th Cir. 1948) ................................................................................. 14

24

*Hegler v. Borg,*

25
    50 F.3d 1472 (9th Cir. 1995) ................................................................................. 14

26

*Magnesystems, Inc. v. Nikken, Inc.,*

27
    933 F. Supp. 944 (C.D. Cal. 1996) ....................................................................... 13

28

**Table of Authorities**
(continued)

Page(s)

*In re Mahoney*,
   80 B.R. 197 (Bankr. S.D. Cal. 1987) ................................................................. 25, 26

*Milgard Tempering, Inc. v. Selas Corp. of Am.*,
   902 F.2d 703 (9th Cir. 1990) ................................................................................. 13

*Nat'l Union Fire Ins. Co. v. Garber*,
   2006 U.S. Dist. LEXIS 53448 (E.D. Cal. July 18, 2006) ................................. 14, 17

*Nicholas v. United States*,
   384 U.S. 678 (1966) .............................................................................................. 19

*Pit River Home & Agric. Coop. Ass'n v. United States*,
   30 F.3d 1088 (9th Cir. 1994) ................................................................................. 13

*In re Rapp*,
   2009 Bankr. LEXIS 4287 (Bankr. C.D. Cal. July 31, 2009) ................................ 19

*In re Rolland*,
   317 B.R. 402 (Bankr. C.D. Cal. 2004) ................................................................. 20

*In re Sanford Fork & Tool Co.*,
   160 U.S. 247 (1895) .............................................................................................. 14

*Sexton v. Dreyfus*,
   219 U.S. 339 (1911) .............................................................................................. 19

*In the Matter of SNTL Corp.*,
   571 F.3d 826 (9th Cir. 2009) ................................................................................. 18

*In re Tharp Ice Cream Co., Inc.*,
   25 F. Supp. 417 (E.D. Pa. 1938) .................................................................... 23, 24

*United States v. Bentson*,
   947 F.2d 1353 (9th Cir. 1991) ............................................................................... 20

*United States v. Cote*,
   51 F.3d 178 (9th Cir. 1995) ................................................................................... 14

*Veyna v. Orange County Nursery*,
   170 Cal. App. 4th 146 (2009) ................................................................................. 6

*In re Western Real Estate Fund, Inc.*,
   109 B.R. 455 (Bankr. W.D. Okla. 1990) ....................................................... passim

COOLEY LLP
ATTORNEYS AT LAW
SAN DIEGO

iii.

**Table of Authorities**
**(continued)**

**Page(s)**

*In re Westwood Plaza Apartments, Ltd.*,
   150 B.R. 163 (Bankr. E.D. Tex. 1993) ................................................................ 16

*In re Westwood Plaza Apartments, Ltd.*,
   205 B.R. 83 (Bankr. E.D. Tex. 1997) .................................................................. 16

*Wiersma v. Bank of the West (In re Wiersma)*,
   483 F.3d 933 (9th Cir. 2007)................................................................................ 13

*Zodiac Inv. v. California Pozzolan (In re Zodiac Inv.)*,
   1994 U.S. App. LEXIS 37255 (9th Cir. Dec. 23, 1994)....................................... 14

STATUTES AND RULES

11 U.S.C. § 105 ....................................................................................................... 27

11 U.S.C. § 502 ................................................................................................. 17, 18

11 U.S.C. § 1122 ..................................................................................................... 23

11 U.S.C. § 1123 ................................................................................................ passim

11 U.S.C. § 1127 ..................................................................................... 2, 16, 27

11 U.S.C. § 1129 ................................................................................................ passim

Fed. R. Bankr. P. 1008 ........................................................................................... 19

Cal. Corp. Code § 301.............................................................................................. 26

Cal. Corp. Code § 400.............................................................................................. 25

Cal. Corp. Code § 708.............................................................................................. 25

Cal. Corp. Code § 1800............................................................................................. 4

Cal. Corp. Code § 2000....................................................................................... passim

OTHER AUTHORITIES

7 COLLIER ON BANKRUPTCY ¶ 1123.01 ................................................................ 26

18 James W. Moore et al., MOORE'S FEDERAL PRACTICE, ¶ 134.21[1] (3d ed. 2009) ................ 13

M. Krotinger, *Management And Allocation Of Voting Power In Corporate
   Reorganizations*, 41 COLUM. L. REV. 646, 667 (1941)....................................... 25

COOLEY LLP
ATTORNEYS AT LAW
SAN DIEGO

1    The Minority Voting Trust, David F. Veyna, Carmen Veyna, and Anna M. Zankel,

2    Trustees (the "Minority") hereby renews its Motion (the "Motion") for an Order (i) requiring the

3    debtor Orange County Nursery, Inc. (the "Debtor" or " OCN") to modify the current Fourth

4    Amended Plan of Reorganization [Docket No. 414] (as amended, the "Plan") to conform to the

5    District Court Order (defined below) and in conformance with 11 U.S.C. § 1127 or, in the

6    alternative, vacating, in part, this Court's Order Confirming Fourth Amended Plan of

7    Reorganization [Docket No. 462] ("Confirmation Order") and Plan as to Classes 5B and 7 and

8    confirming the Minority's Alternative Plan (defined below); (ii) vacating the Order Regarding

9    Creditor Minority Voting Trust's Motion for an Order Determining Priority of Claims" [Docket

10   No. 350] (the "Claim Determination Order"); and (iii) Vacating the "Order Granting Debtor's

11   Motion to Disallow Portion of Minority Voting Trust's Claim No. 73" [Docket No. 488] (the

12   "Attorney Fee Order").

13       The Motion is supported by (1) a Memorandum of Points and Authorities; (2) a Request

14   for Judicial Notice ("RJN"); (3) the declaration of Ali M.M. Mojdehi pursuant to LBR 9013-1(l)

15   (the "Mojdehi Declaration"); (4) the supplemental declaration of Charles Miller (the "Miller

16   Supplemental Declaration"); and (5) Appendix of Cited Unpublished Opinions pursuant to LBR

17   9013-2(b)(4).

18   <u>**MEMORANDUM OF POINTS AND AUTHORITIES**</u>

19   **I.    INTRODUCTION**

20       On April 23, 2012, the United States Court of Appeals for the Ninth Circuit (the "Ninth

21   Circuit") dismissed as interlocutory the Debtor's appeal of the order of the United States District

22   Court for the Central District of California (the "District Court"), entered on October 12, 2010

23   (the "District Court Order"), which reversed and remanded three related orders of this Court – (1)

24   the Claim Determination Order; (2) the Confirmation Order; and (3) the Attorney Fee Order.  As

25   per the Ninth Circuit's order, it is for the Bankruptcy Court to enforce and implement the District

26   Court Order.  There is no impediment, and it is the Bankruptcy Court's "obligat[ion]" to do so.[1]

27

28   _____

[1] RJN, Ex. K (District Court's Order Affirming Bankruptcy Court's Denial of Emergency Motion) at 3, § B.

COOLEY LLP
ATTORNEYS AT LAW
SAN DIEGO

750090 v9/SD    2.

1    As set forth in its Order, the District Court ruled, and it is now law of the case, that (1) the

2    Minority holds a claim against the Debtor's estate, by virtue of the pre-petition state court

3    judgment it obtained pursuant to California Corporations Code § 2000 ("Section 2000" and the

4    claim, the "Section 2000 Claim"); and (2) the Minority's separate claim for attorneys' fees and

5    expenses under Section 2000 (the "Attorney Fee Claim") was, as a matter of statutory

6    interpretation, not limited to the amount of the pre-petition bond posted by OCN (*i.e.*, $150,000)

7    (the "Bond").

8    As described in further detail below, the value of the Section 2000 Claim, which may be

9    assessed from the undisputed facts already before this Court, is at least **$2.5 million**.  And the

10    amount of the Attorney Fee Claim equates to the actual amount of fees and expenses incurred "in

11    connection with OCN's election on June 26, 2007 to purchase the Shares pursuant to Section

12    2000, according to proof,"[2] which is approximately **$916,000**.  (*See* Miller Suppl. Decl., ¶ 9.)

13    Whatever the amount of the Section 2000 Claim, however, the Debtor has conceded that

14    there is no property with which to pay the Minority's Section 2000 Claim.  Moreover, by virtue of

15    the fact that the Confirmation Order was reversed by the District Court, it is also law of the case

16    that the Plan as it presently exists is *not* confirmable.  The Plan is not feasible and violates section

17    1129(b)(2)(B) of the Bankruptcy Code, because it purports to "cram down" Class 5B, but fails to

18    provide any mechanism for payment in full of the present value of the Section 2000 Claim.  Even

19    though the claims of holders in Class 5B are not paid under the Plan, the Plan still allows Class 7

20    equity interests to retain their economic interests and receive value under the Plan.  The Plan

21    therefore is not fair and equitable as it violates the Absolute Priority Rule.  Additionally, the Plan

22    violates the provisions of 11 U.S.C. 1123(a)(6) and (7) because it allows the equity holders in

23    Class 7 to retain their voting rights to elect the current board of directors of OCN and retain

24    control of the company, even though their economic interest in OCN is necessarily eliminated.

25    Under the Minority's proposed modifications to the Plan, there is a path to resolution.

26    The Minority is willing to accept 100% ownership in the Reorganized Debtor in satisfaction of its

27

28    ---
[2] RJN, Ex. A (Superior Court Judgment), ¶ 6.

1   Section 2000 Claim.  The Minority's proposed modifications to the Plan (as embodied in the

2   Alternative Plan) would bring the Plan into compliance with both the Bankruptcy Code,

3   California law and the District Court's orders.

4        Pursuant to the mandate rule and the law of the case doctrine, then, the Plan must either (i)

5   be modified solely as to Classes 5B and 7 to render the Plan consistent with treatment of the

6   Section 2000 Claim as a claim and otherwise satisfying all the requirements for confirmation

7   under Chapter 11 as to Class 5B, or failing that, (ii) the order confirming the Plan must be vacated

8   solely as to Classes 5B and 7, which were affected by the District Court Order [*see* District Court

9   Order at 11], and the Minority's Alternative Plan be confirmed in its place.

10       In this respect, the Minority hereby attaches its proposed alternative plan as Exhibit "1"

11  hereto ("Alternative Plan")[3] and hereby seeks confirmation of the same.  The Alternative Plan

12  leaves all parties, with the exception of current equity and the Minority, in the same position as

13  under the original Plan.

14  **II.      FACTUAL AND PROCEDURAL BACKGROUND**

15       By way of background, what follows is a recitation of the facts leading up to the

16  bankruptcy filing and the various relevant proceedings in this Court, the District Court and the

17  Ninth Circuit.

18       **A.      Pre-Petition Events**

19       The Debtor is a closely held corporation which has been continuously run by the Veyna

20  family.  Prior to the Petition Date, it operated as a wholesale tree nursery selling bare root and

21  containerized trees.

22       The majority shareholders of OCN ("Majority") currently control the company through a

23  voting trust owning 50.25 percent of the company's stock, which stock the Majority retained

24  under the Plan.  The Minority owns 40.25 percent of the stock.

25       On August 4, 2006, the Minority, alleging, *inter alia*, mismanagement, oppression and

26  malfeasance by the Majority, initiated an action for, among other things, dissolution under Cal.

27
    _____
28  [3] This is the same version of the Alternative Plan approved by the Official Committee of
    Unsecured Creditors (the "Committee").  [*See* Docket No. 548.]

1    Corp. Code §§ 1800(b)(4) and (b)(5) ("Dissolution Action") in the Superior Court for the State of

2    California, County of Orange ("Superior Court").

3        After almost one full year of preparing for the trial in the Dissolution Action, during

4    which the Minority obtained compelling evidence to prove its case, OCN notified the Superior

5    Court of its election to purchase the Minority's shares of stock in OCN pursuant to Cal. Corp.

6    Code § 2000 on June 29, 2007.

7        The parties could not agree on the fair value of the Minority's shares, and pursuant to

8    Sections 2000(b) and (c), on August 10, 2007, the Superior Court appointed three independent

9    appraisers to value OCN and also entered an order staying the Dissolution Action.

10        On October 14, 2008, the appraisers submitted their unanimous report, determining the

11    discounted fair value of OCN, as of August 4, 2006 (*i.e.*, the date the Dissolution Action was

12    commenced, pursuant to Section 2000(f)) to be $12.9 million.

13        On November 21, 2008, the Superior Court entered the decree confirming the appraisers'

14    valuation, conclusively determining the pro-rata price payable for the Minority's shares to be

15    $4,906,475.00, plus one year of interest in the amount of $343,453, for a total award of

16    $5,249,928.00 (hereinafter, the "Judgment").  A true and correct copy of the Judgment is attached

17    to the RJN as **Exhibit A**.  Pursuant to Section 2000, "[t]he award of the appraisers or of a

18    majority of them, when confirmed by the court, shall be final and conclusive upon all parties."

19    As such, the value set forth in the Superior Court's Judgment became res judicata and immune to

20    any collateral attack.  The Judgment required that the payment be tendered to the Minority on or

21    before December 15, 2008.

22        Furthermore, pursuant to the requirements of Section 2000(c), the Judgment  ordered in

23    the alternative that

24        OCN is hereby ORDERED liquidated, wound up and dissolved if payment
     in [ ] full is not timely received by plaintiffs' counsel.  **In such event**, 1)
25    **judgment shall be entered against OCN** and its surety or sureties **for all**
     **expenses and attorneys' fees incurred by plaintiffs** in connection with OCN's
26    election on June 26, 2007 to purchase the Shares pursuant to Corporations Code §
     2000, according to proof; and 2) the parties shall attend a case management
27    conference before this Court on December 19, 2008, 2 p.m., to discuss issues

28

related to liquidation, including the possible appointment of a receiver to assume
control of OCN and supervise the liquidation process.

Ex. A, ¶ 6 (emphasis added).

On December 5, 2008, OCN appealed the Judgment, also petitioning the California Court of Appeal for a stay of enforcement of the Judgment.  The California Court of Appeal denied the motion for stay and held that no writ of supersedeas could automatically issue, absent the tender of the full buyout price to the Superior Court.  *See Veyna v. Orange County Nursery*, 170 Cal. App. 4th 146, 155-56 (2009).

The Court of Appeal then extended the date for OCN's payment for the Minority's shares to 4:00 p.m. on January 22, 2009.  *Id.*

**B.      Post-Petition Events**

OCN filed a voluntary petition in bankruptcy for reorganization under chapter 11 of the Bankruptcy Code on January 22, 2009 at 1:57 p.m. (the "Petition Date").  [*See* Docket No. 1.]

**1.      The Debtor's Schedules**

On February 20, 2009, the Debtor filed its Schedules of Assets and Liabilities (together, the "Schedules").  [*See* Docket No. 101.]  A true and correct copy of the Debtor's Schedules is attached to the RJN as **Exhibit B**.  The Debtor later amended its Schedules.  [*See* Docket No. 200.]  A true and correct copy of the Debtor's amended Schedules is attached to the RJN as **Exhibit C**.

**2.      The Minority's Proof of Claim**

On May 14, 2009, the minority filed a Proof of Claim (No. 73) in the amount of $6,008,424.75, based upon the Judgment and interest thereon, as well as attorneys' fees and expenses provided for under Section 2000 (the "Proof of Claim").  A true and correct copy of the Proof of Claim is attached to the RJN as **Exhibit D**.

**3.      The Claim Determination Order**

On October 16, 2009, after notice and hearing, the Court entered the Claim Determination Order, which held that the Minority did not possess a claim against the Debtor's estate on account of the Judgment, except as to its pre-petition fees and costs incurred in connection with the

1    Dissolution Action (the "Attorney Fee Claim").  The Claim Determination Order essentially held

2    that the Section 2000 Claim did not exist, because the Minority was "equity as to its shares of

3    stock."  [*See* Docket Nos. 350 & 352.]

4        The Minority timely appealed the Claim Determination Order to the District Court on

5    October 23, 2009.  [*See* Docket No. 354.]

6                    **4.    The Confirmation Order**

7        On November 16, 2009, the Debtor filed its (i) Third Amended Plan of Reorganization

8    [Docket Nos. 375] ("Third Amended Plan"); and (ii) Third Amended Disclosure Statement

9    Describing Debtor Orange County Nursery Inc.'s Second Amended Plan of Reorganization

10    [Docket Nos. 376] ("Third Amended Disclosure Statement").

11        The Third Amended Plan did not mention the Minority's Section 2000 Claim.  The

12    Attorney Fee Claim was classified in Class 5 along with a claim of an insider of the Majority,

13    each of which were to be paid pro-rata monthly, following payment of all general unsecured

14    claims in full.  [*See* Docket No. 375 at 15, § 7.5.]  The Third Amended Plan contained no

15    provision for what would occur should the Claim Determination Order be reversed on appeal by

16    the District Court.

17        At the hearing on the Third Amended Disclosure Statement held on December 22, 2009

18    (the "Disclosure Statement Hearing"), the Bankruptcy Court conditionally approved the Debtor's

19    Disclosure Statement, provided that the Debtor would make amendments to the Plan.  [*See*

20    Docket No. 418.]   A true, correct and certified copy of the transcript from the Disclosure

21    Statement Hearing is attached to the RJN as **Exhibit E**.   The Bankruptcy Court made the

22    following findings on the record:

23        The Minority's equity Interest under Class 7 was "impaired" because of the
24        injunction that prevented them from exercising their legal rights.  [*See* RJN, Ex. E
        at 5:14-18.][*See* RJN, Ex. E at 5:14- 18.]

25        The Minority's success on the Claim Determination Order appeal would cause a
26        default under the Third Amended Plan.  [*Id.* at 6:3-10.]

27        Because the Minority's Interest under Class 7 was impaired it would be necessary
        for the Third Amended Plan to fulfill the requirements for a "cram down."  [*Id.*]
28

The Debtor's plan would be infeasible unless the Debtor made modifications to specify alternative treatment under the Plan upon reversal of the Claim Determination Order. [*Id.*]

To fulfill the requirements for a "cram down" under 11 U.S.C. § 1129(b), the plan must provide that if the Claim Determination Order was reversed, **equity must receive nothing under the Plan unless the full amount of the Minority's claim was paid under the Plan**. [*Id.* at 26:20-23 (emphasis added).]

In addition, the Debtor admitted on the record at the Disclosure Statement Hearing that should the Minority's Section 2000 Claim be determined to be a claim by the District Court, there would be "no way the company can pay that amount of money." [*Id.* at 6:5-6.]

On January 8, 2010, the Debtor filed its Modified Fourth Amended Disclosure Statement Describing Debtor Orange County Nursery Inc.'s Fourth Amended Plan of Reorganization [Docket No. 413] (hereinafter, the "Disclosure Statement") and Fourth Amended Plan of Reorganization [Docket No. 414] (hereinafter, as amended, the "Plan"). The Plan had been modified by the Debtor from the prior version as to the treatment of the Minority's claim, which was now divided into two components: (i) the Attorney Fee Claim; and (ii) the Section 2000 Claim. The latter was described in the Plan as "a contingency" claim, contained in Class 5B. [*See* Plan at 16, § 7.4.] On January 12, 2010, the Court entered an order approving the Disclosure Statement. [*See* Docket No. 418.]

On February 3, 2010, the Minority filed its objection to confirmation of the Plan. [*See* Docket No. 430.] On February 18, 2010, the Court held a hearing on confirmation of the Plan (the "Plan Confirmation Hearing"). On February 25, 2010, the Court entered the Confirmation Order and made several findings of fact, including with respect to the confirmation requirements of 11 U.S.C. § 1129.

At the Plan Confirmation Hearing, The Court required the Debtor to make further modifications to the Plan relating to the proposed treatment of Class 5B. As amended by the Order Confirming the Debtor's Fourth Amended Plan [Docket No. 462], the treatment of Class 5B as contained in the Plan was as follows:

Class 5B includes solely the Minority Shareholder's attorney fee claim in an amount to be determined plus interest at the rate of 4% per annum from the

Petition Date.   Except with respect to the first $150,000 of the Minority Shareholder's [a]ttorney fee claim, which amount will be paid on the effective date from the bond posted by Debtor in connection with the State Court litigation, the Debtor will pay holders of Allowed Claims in Class 5 an amount equal to the full amount of their claim as follows.

(a)      Debtors will pay the Claim in Class 5B a monthly amount commencing in approximately Fiscal Year ending 2015 (or as soon as the Debtor pays in full all unsecured and Class 5A claims in the amount of $5,000 per month.

(b)      In addition, Class 5B includes, as a contingency, the alleged claim of the Minority Shareholders for approximately $5 million.   In the event the Appellate Court enters a final order prior to the Date the Plan is substantially consummated reversing the Bankruptcy Court's ruling and finding that the Minority holds an allowed claim subordinated to unsecured creditors but with priority over the equity, and if the Debtor cannot pay, or negotiate the payment of the then allowed amount of that claim, then the Debtor shall ___immediately___ commence the liquidation of its assets and distribute the proceeds ___in accordance with the priority scheme set forth in the Code___.

[Confirmation Order at ¶ 4(a) (emphasis added)].   The Plan thus requires that any liquidation be accomplished pursuant to the Absolute Priority Rule and to 11 U.S.C. § 1129(b), which provides that equity may not retain any interest under a plan unless the claims of all creditors objecting to the plan are paid in full under the plan.

The Plan provided that the Court would retain jurisdiction until the entry of a final decree closing the case.   [Plan § 11.1.]   The retained jurisdiction of the Court included, without limitation, the "correction of any defect, curing of any omission, or the reconciliation of any inconsistency in the Plan or in the Order of Confirmation, as may be necessary to carry out the purposes and intent of the Plan."   [*Id.*]

5.      **The Minority's Appeal of the Confirmation Order and Receipt of a Stay of the Confirmation Order**

The Minority timely appealed the Confirmation Order.   [*See* Docket No. 463.]   On March 11, 2010, the District Court entered an order granting the Minority's motion for a temporary stay of the Confirmation Order (as modified and clarified, the "Stay Order").   A true and correct copy of the Stay Order is attached to the RJN as **Exhibit F**.   The District Court modified the Stay Order by order entered March 18, 2010, by lifting the stay "for claims with a priority equal to or

higher than class 4 general unsecured creditors" but keeping the stay "in effect for all other claims." A true and correct copy of the modified Stay Order is attached to the RJN as **Exhibit G**.

On April 14, 2010, the District Court further clarified the Stay Order by "allow[ing] the Plan's Effective Date to go forward to the extent required for the Debtor's performance of its obligations with respect to … claims with a priority equal to or higher than class 4 general unsecured [claims]." A true and correct copy of the further clarified Stay Order is attached to the RJN as **Exhibit H**. This last order clarifying the Stay Order explicitly stated that the Confirmation Order was "not final as to the provisions [of the Plan] that remain stayed." [*See* RJN, Ex. H.] The Effective Date of the Plan for claims in Class 4 and higher **only** was on or about April 28, 2010. [*See* Docket No. 532 (First Post-Confirmation Status Report).]

### 6.    The Attorney Fee Order

On March 22, 2010, after notice and hearing, this Court entered the Attorney Fee Order, construing Section 2000 to limit the Minority's Attorney Fee Claim to the amount of the bond that had been posted pre-petition by the Debtor in the amount of $150,000 (the "Bond"). [*See* Docket No. 488.] The Court did not make any further findings regarding the amount of fees and costs claimed by the Minority. Moreover, at the hearing on the Attorney Fee Claim held on March 3, 2010, the Debtor submitted on the record to the Court's determination to allow the Minority's fees and costs, subject only to a limitation for the amount of the Bond. [*See* Docket No. 478 at 1, lines 16-17.]

The Minority timely appealed the Attorney Fee Order on March 30, 2010. [*See* Docket No. 490.]

### 7.    The District Court Order

The District Court Order[4] reversed the Claim Determination Order and the Attorney Fee Order, each as a matter of law. The District Court Order also required that the Confirmation Order be vacated or modified, to the extent the Plan violated the requirements for confirmation of

---

[4] An identical order was entered in each of the three appeals of the Claim Determination Order, the Confirmation Order and the Attorney Fee Order. The singular "District Court Order" refers to all three orders, and therefore only one District Court Order is attached to the RJN.

1    a plan under the Bankruptcy Code, resulting from the District Court's reversals of both the Claim

2    Determination Order and the Attorney Fee Order.  A true and correct copy of the District Court

3    Order is attached to the RJN as Exhibit I.[5]

4    On November 11, 2010, the Debtor appealed the District Court Order[6] to the Ninth

5    Circuit.

6    **8.    The First Motion to Enforce the District Court Order**

7    On November 22, 2010, the Minority filed in the Bankruptcy Court an "Emergency

8    Motion for Order Compelling Debtor to Modify Fourth Amended Plan of Reorganization or, in

9    the Alternative, Vacating Confirmation Order and Debtor's Fourth Amended Plan of

10    Reorganization, in Part, and Confirming Plan Proposed by Minority," including proposed

11    Alternative Plan [Docket No. 537] (the "Emergency Motion"), which sought essentially the same

12    relief requested in this Motion.  After a hearing, on December 23, 2010, the Court entered an

13    order denying the Emergency Motion, on the ground that it lacked jurisdiction while the Debtor's

14    appeal of the District Court Order to the Ninth Circuit was pending (the "Order Denying

15    Emergency Motion").  [*See* Docket No. 561.]  A true and correct copy of the Order Denying

16    Emergency Motion is attached to the RJN as **Exhibit J**.  *See also generally* Mojdehi Decl.

17    On January 6, 2011, the Minority timely appealed the Order Denying Emergency Motion

18    to the District Court.  [*See* Docket No. 565-568].[7]

19    On April 13, 2012, the District Court entered an order affirming the Bankruptcy Court's

20    Order Denying Emergency Motion, holding, *inter alia*, that the Bankruptcy Court "erred in its

21    conclusion that it lacked authority to enforce or implement the [District Court Order] while that

22

23    [5] *See also* RJN, Ex. J (Order Denying Emergency Motion (as defined below)) at 3 ("The District
      Court also required the Bankruptcy Court's confirmation order be vacated or modified, to the

24    extent the plan violated the requirements for confirmation of a plan under the

25    .").

      [6] In each of the three District Court appeals.

26    [7] In addition, on February 18, 2011, the Minority filed in the District Court both (i) a "Motion for
      Order Partially Withdrawing the Reference" ("Motion to Withdraw Reference") and (ii) "Petition

27    for Writ of Mandamus Compelling Bankruptcy Court to Enforce District Court's Remand Order"
      ("Mandamus Petition").  On March 24, 2011, the District Court entered an order denying the

28    Motion to Withdraw Reference.

Cooley LLP
Attorneys At Law
San Diego

1    Order is on appeal in the Ninth Circuit," and in fact, because the Debtor "neither sought nor

2    obtained a stay of [the District Court Order], … **the Bankruptcy Court was obligated to**

3    **implement it**" (emphasis added).  However, the District Court further held that the Bankruptcy

4    Court did not abuse its discretion "in staying the proceedings pending a decision from the Ninth

5    Circuit."  A true and correct copy of the District Court's order affirming the Bankruptcy Court's

6    Order Denying Emergency Motion is attached to the RJN as **Exhibit K**.[8]

7                    **9.        The Ninth Circuit Appeal**

8             On March 17, 2011, the Minority filed a "Motion to Dismiss Orange County Nursery,

9    Inc.'s Appeals as Interlocutory" in the Ninth Circuit (the "Motion to Dismiss").

10            On June 9, 2011, Peter L. Shaw, Appellate Commissioner for the Ninth Circuit, entered an

11   order consolidating the appeals and denying the Motion to Dismiss without prejudice to the

12   Minority raising the argument again in its merits brief.

13            On April 23, 2012, the Ninth Circuit entered an unpublished memorandum dismissing the

14   Debtor's appeal of the District Court Order as interlocutory (the "Dismissal Order").  A true and

15   correct copy of the Dismissal Order is attached to the RJN as **Exhibit L**.

16            On April 30, 2012, in light of the entry of the Dismissal Order, the Bankruptcy Court

17   scheduled a status conference for May 29, 2012 and directed the parties to submit, prior to the

18   hearing, a joint status report "outlining the issues that need to be resolved and what process they

19   suggest to accomplish this task."  [*See* Docket No. 590.]  The Minority will be meeting and

20   conferring with Debtor's counsel in connection with the drafting of the joint status report

21   pursuant to the Court's order but respectfully submits that this Motion will clearly outline the

22   issues and otherwise creates a process for resolving them.

23

24

25

26

27   _____
     [8] Also on April 13, 2012, the District Court entered an order denying the Mandamus Petition,
     which order relied on the reasoning set forth in the District Court's order affirming the Order
28   Denying Emergency Motion and essentially incorporated that order by reference.

### III.   AUTHORITIES AND ARGUMENT

What needs to be done and how are framed and dictated by the District Court Order, the mandate rule and the law of the case doctrine.  The relief sought in the Motion complies with all three and for that reason should be granted.

### A.   Law of the Case Doctrine

Before delving into the merits of the specific amendments that are required to be made to the Plan (and which have been incorporated into the Minority's Alternative Plan) to bring the Plan into conformity with the District Court Order, it is necessary to first discuss the impact of the procedural posture on the proper scope for the amendments to be made pursuant to the District Court's remand of the Confirmation Order to this Court.  See RJN, Ex. I at 12 ("To the extent the [Confirmation Order] … treat[s] the Minority's interest as equity, these orders will need to be vacated or modified consistent with this Order."); see also RJN, Ex. K at 3 ("the Bankruptcy Court is obligated to implement" the District Court Order).

In the Ninth Circuit, under the law of the case doctrine "a court is ordinarily precluded from reexamining an issue previously decided by the same court, or a higher court, in the same case." *Wiersma v. Bank of the West (In re Wiersma)*, 483 F.3d 933, 941 (9th Cir. 2007) (citations and internal quotation marks omitted); *see also Arizona v. California*, 460 U.S. 605, 618 (1983) ("[T]he doctrine posits that when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case.").

The law of the case doctrine is a judge-made rule "designed to aid in the efficient operation of court affairs."  *Milgard Tempering, Inc. v. Selas Corp. of Am.*, 902 F.2d 703, 715 (9th Cir. 1990).  The doctrine is a discretionary one "created to maintain consistency and avoid reconsideration, during the course of a single continuing lawsuit, of those decisions that are intended to put a matter to rest."  *Pit River Home & Agric. Coop. Ass'n v. United States*, 30 F.3d 1088, 1097 (9th Cir. 1994) (citation omitted).  As such, "common sense," not a rigid set of rules, is the touchstone to a sound application of the law of the case doctrine.  18 James W. Moore et al., MOORE'S FEDERAL PRACTICE, ¶ 134.21[1] (3d ed. 2009); *see also Magnesystems, Inc. v. Nikken, Inc.*, 933 F. Supp. 944, 949 (C.D. Cal. 1996) (noting that because any court has inherent

1    power to alter its own prior rulings, law-of-the-case doctrine is merely "an expression of good

2    sense and wise judicial practice").

3        Because the purpose of the doctrine is to promote judicial finality, it necessarily follows

4    that the law of the case acts as a bar only when the issue in question was actually considered and

5    decided by the first court.  *Hegler v. Borg*, 50 F.3d 1472, 1475 (9th Cir. 1995).  While "the

6    doctrine applies to a court's explicit decisions as well as those issues decided by necessary

7    implication, it clearly does not extend to issues" not addressed.  *Id.*  Applied in the context of a

8    reversal and remand, it follows that "a judgment of reversal by an appellate court is an

9    adjudication only of matters expressly discussed and decided, which become the law of the case

10   in further proceedings on remand and appeal."  *Zodiac Inv. v. California Pozzolan (In re Zodiac*

11   *Inv.)*, 1994 U.S. App. LEXIS 37255, *8 (9th Cir. Dec. 23, 1994) (quoting *Hansen & Rowland v.*

12   *C.F. Lytle Co.*, 167 F.2d 998, 999 (9th Cir. 1948)); *see also Nat'l Union Fire Ins. Co. v. Garber,*

13   2006 U.S. Dist. LEXIS 53448, *35 (E.D. Cal. July 18, 2006) ("The law of the case doctrine states

14   that the decision of an appellate court on a legal issue must be followed in all subsequent

15   proceedings in the same case.") (quoting *United States v. Cote*, 51 F.3d 178, 181 (9th Cir. 1995)).

16       **B.    The Mandate Rule**

17       On a remand to the trial court upon reversal by an appellate court, the trial court is bound

18   by the "mandate rule," which is a corollary of the law of the case doctrine.  In the Ninth Circuit,

19   the mandate rule is applied strictly so that a trial court, upon receiving the mandate of an appellate

20   court, "cannot vary it or examine it for any other purpose than execution."  *Cote*, 51 F.3d at 181

21   (quoting *In re Sanford Fork & Tool Co.*, 160 U.S. 247, 255 (1895)).  The trial court may,

22   however, consider any matters left open by the appellate court's mandate, although such

23   determinations may not deviate from the mandate.  *Id.* at 182.

24       The mandate rule, of course, applies with equal force to the remand of an order

25   confirming a plan of reorganization.  A detailed discussion of the approach that is required to be

26   taken by a bankruptcy court under the mandate rule where an order is entered by the appellate

27   court reversing and remanding an order confirming a plan of reorganization is found in *In re*

28   *Western Real Estate Fund, Inc.*, 109 B.R. 455 (Bankr. W.D. Okla. 1990).  In *Western Real Estate*

*Fund*, the district court reversed and remanded an order confirming the debtor's plan on two grounds: (i) the debtor's confirmed plan violated the fair and equitable standard of 11 U.S.C. § 1129(b)(2)(A) and (B); and (ii) because claimants junior to the appellant (a secured creditor) were to receive property under the plan, the plan also violated the absolute priority rule under Section 1129(b)(2)(B)(ii). *Id.* at 460. The district court remanded the confirmation order to the bankruptcy court "for further proceedings consistent with [its] Order." *Id.* at 457.

On remand, the bankruptcy court first outlined the scope of the mandate and explained the limited nature of the modifications that must be made to the Plan. In sum, the scope of the parties and issues that were on appeal defines the limits of what may be done to a plan on reversal and remand of a confirmation order. First, the court analyzed the procedural posture resulting from the reversal. Where only the appellant had appealed the order of confirmation, the effect of the district court's mandate was to place the appellant in the position that "the plan of reorganization should not have been confirmed as to [the appellant]." *Id.* at 460. To the contrary, the court noted that the mandate by the appellate court had no effect on persons that were not parties to the appeal or issues not bound up in the appeal. *See id.* at 463. The amendments would thus have no impact on transactions having taken place with respect to other creditors under the plan, particularly where the plan had already become effective and thus res judicata as to those non-appealing creditors. *See id.* at 462-63. Thus, any amendments to be made to the plan should be limited to correcting the earlier erroneous treatment of the appellant's claim under the plan, that is, to reconfirm a new plan with respect to that creditor. *Id.* at 466. As a result, the only matter properly before the bankruptcy court on remand was whether the plan amendment was confirmable under the requirements of the Bankruptcy Code with respect to the appellant's claims alone. *See id.*

Next, the bankruptcy court rejected arguments that because the plan had been "substantially consummated" it could not be modified on remand. The bankruptcy court explained that because the order reversing and remanding as to appellants "placed the case, as it relates to [appellants] in a pre-disclosure and pre-confirmation posture, what may have gone

1    before with regard to other creditors was irrelevant. *Id.* at 466. The posture of the case on

2    remand was "as though the plan had never been confirmed as to [appellant]." *Id.*

3         Upon a remand, a proposed plan modification offered by the debtor or plan proponent

4    under Section 1127 is additionally subject to the mandate rule, that is, it must conform to the

5    letter and the spirit of the appellate court's order and may not otherwise exceed the scope of the

6    appellate mandate. *See*, *e.g.*, *Dep't of Housing & Urban Dev. v. Westwood Plaza Apartments,*

7    *Ltd. (In re Westwood Plaza Apartments, Ltd.)*, 192 B.R. 693 (E.D. Tex. 1996). In that case, for

8    example, an order confirming a plan of reorganization was remanded to the bankruptcy court. In

9    *Westwood Plaza*, as here, the appellant had received partial stay pending appeal of the

10   confirmation order, which had been crafted to allow the plan to be implemented in ways that did

11   not destroy the appellant's rights during the pendency of the appeal. *See In re Westwood Plaza*

12   *Apartments, Ltd.*, 150 B.R. 163, 169 (Bankr. E.D. Tex. 1993). The district court reversed the

13   confirmation order, ruling that the confirmed plan failed to comply with 11 U.S.C. § 1129(b),

14   because the interest rate provided to the secured lender was clearly erroneous. *See* 192 B.R. at

15   697. On remand, however, the debtor attempted to propose a new limitation on the creditor's

16   rights, capping the unsecured portion of the creditor's claim at 10 cents on the dollar. The

17   bankruptcy court held this proposed modification to be improper, stating that the "mandate rule"

18   limited its action to correcting the errors specifically mentioned by the district court's order. *See*

19   *In re Westwood Plaza Apartments, Ltd.*, 205 B.R. 83, 84 (Bankr. E.D. Tex. 1997). The

20   bankruptcy court explained that "it is error to grant relief not mandated by the remanding

21   appellate court. … Explicit rulings on issues that were before the higher court and explicit

22   directives by that court to the lower court concerning proceedings on remand are not dicta." *Id.*

23   (internal citations omitted).

24        Simply stated, a remand order of an appellate court must be executed. *See* RJN, Ex. K at

25   3 (holding, *inter alia*, that the Bankruptcy Court is "obligated to implement" the District Court

26   Order). Under the mandate rule, on remand of an order confirming a plan, the debtor must

27   propose appropriate and feasible modifications to the existing plan pursuant to 11 U.S.C. § 1127

28   that benefit the *estate* and not the Debtor individually. *Cf. Everett v. Perez (In re Perez)*, 30 F.3d

1209, 1218-19 (9th Cir. 1993) (noting debtor's counsel's fiduciary duty to adhere to the requirements under Section 1129 of the Bankruptcy Code and to refrain from using the plan process to manipulate creditors or produce a procedural advantage to the debtor at the expense of "a just, speedy, inexpensive and lawful path out of bankruptcy" for the estate). Failing that, the confirmation order must instead be vacated and a new plan must be confirmed, either in whole or in part. *See*, *e.g.*, *First Brandon Nat'l Bank v. Kerwin-White*, 109 B.R. 626, 628 (D. Vt. 1990) (ordering the debtor to prepare a completely new plan on remand). Therefore, to the extent the Debtor indicates it is unwilling or unable to propose the necessary modifications to the Plan, the Minority requests that the order confirming the Plan be vacated and that the Minority's Alternative Plan be confirmed by the Court instead.

### C.    The District Court Order

As set forth above, the factual findings and legal determinations made in the District Court Order are "law of the case" and "must be followed in all subsequent proceedings in the same case." *Nat'l Union Fire Ins. Co., supra*, 2006 U.S. Dist. LEXIS 53448 at *35.

The mandate of the District Court Order is three-fold:

**1.**    Value the Section 2000 Claim;

**2.**    Value the Attorney Fee Claim; and

**3.**    Vacate or modify the Confirmation Order "[t]o the extent [it] treat[s] the Minority's interest as equity." RJN, Ex. I at 11, ll. 2-5.

### D.    Valuing the Section 2000 Claim

As explained further below, valuation of the Section 2000 Claim is simplified because of two undisputed facts: (1) the Debtor has admitted that it has no funds to pay the Minority's Section 2000 Claim; and (2) the Minority is willing to accept 100% ownership of the Reorganized Debtor in satisfaction of its Section 2000 Claim under a modified Plan or the Minority's Alternative Plan – either of which would cure the statutory defects in the current Plan.

Valuation is straightforward given that (i) section 502 of the Bankruptcy Code mandates that unsecured claims be valued as of the date of filing of the bankruptcy petition; and (ii) the Debtor makes judicial admissions in its Schedules and amended Schedules clearly showing more

than $6 million of equity held by the Debtor as of the Petition Date.  The Minority's Section 2000 Claim, which is equal to the value of its shares or 40.25% of the equity in the company, would therefore be approximately $2.5 million.

However, for purposes of determining the Motion and as explained further below, all that the Minority must prove is that the Section 2000 Claim is of an amount that the Debtor cannot pay off in full under the Plan.  At the Disclosure Statement Hearing on December 22, 2009, the Debtor admitted that should the Minority's claim be determined as a claim by the District Court, there would be "no way the company can pay that amount of money."  [*See* RJN, Ex. E at 6:5-6.] Indeed, according to the Debtor, "there is **no** value in the company to pay **any** creditor with priority higher[9] than the general unsecured creditors," meaning that if the Section 2000 Claim is valued at *any* amount over $0, the Plan violates the Absolute Priority Rule in that the class of equityholders retains its interest even though the Minority's Section 2000 Claim – a dissenting class – cannot be paid in full.  [*See* Docket No. 543 at 14, ll. 14-15 (emphasis added)]; *see  Perez*, *supra*, 30 F.3d at 1214 ("because claims of equity holders are always junior to claims of creditors … a bankruptcy court may not approve a plan that gives the debtor any interest in the reorganized estate unless the plan provides for the full payment of claims of creditors in the objecting class").

### 1. Unsecured Claims Are Valued as of the Petition Date

Under section 502(b) of the Bankruptcy Code, "the court, after notice and a hearing, shall determine the amount of [a] claim in lawful currency of the United States **as of the date of the filing of the petition**, and shall allow such claim in such amount." 11 U.S.C. § 502(b) (emphasis added); *see also In the Matter of SNTL Corp.*, 571 F.3d 826, 838 (9th Cir. 2009) ("[s]ection 502(b) provides that a court is to determine the amount of a prepetition claim 'as of the date of the filing of the petition, and … allow such claim in such amount.'") (quoting 11 U.S.C. § 502(b)). "This section prevents the value of a claim from fluctuating by freezing the claim as of the petition date."  *In re Global Power Equip. Group Inc.*, 2008 Bankr. LEXIS 455, *13 (Bankr. D. Del. Feb. 14, 2008) (determining amount of contract rejection claim by using exchange rate in use

---

[9] This is likely a typographical error and should read "lower."

on petition date, not date of breach, judgment or distribution).[10]  Here, therefore, the Section 2000

Claim should be valued as of the Petition Date (*i.e.*, January 22, 2009) and not any other date.

## 2.      The Value of the Section 2000 Claim Is in Excess of $2.5 Million

Here, all of the evidence necessary to value the Section 2000 Claim is before the Court,

and a valuation hearing is unnecessary.  As noted above, according to the Debtor's own

Schedules, as of the Petition Date, the Debtor had total assets of $15,355,214.83 and total

liabilities of $9,183,746.65.  [*See* RJN, Ex. B.].  The Debtor later amended its Schedules by (i)

increasing the value of its personal property assets by $120,000; (ii) decreasing its aggregate

secured debt by $1,110.21; and (iii) adding three (3) unsecured creditors holding claims totaling

$50,089.00. [*See* RJN, Ex. C].

After amendment, then, as of the Petition Date, the Debtor's total assets equal

$15,475,214.83 and total liabilities equal $9,232,725.44, resulting in total equity in the Debtor of

**$6,242,489.39**.  The Minority's Section 2000 Claim, which is equal to the value of its shares or

40.25% of the equity in the company, would therefore be **$2,512,601.98**.

"Statements in bankruptcy schedules are executed under penalty of perjury and when

offered against a debtor are eligible for treatment as judicial admissions."  *In re Bohrer*, 266 B.R.

200, 201 (Bankr. N.D. Cal. 2001) (Jaroslovsky, B.J.) (citing *In the Matter of Gervich*, 570 F.2d

247, 253 (8th Cir. 1978)).  This is so because, as stated above, pursuant to Bankruptcy Rule 1008,

"[s]chedules and statements are signed under penalty of perjury[, and] … [d]ebtors are presumed

to have read the schedules and statements before signing the documents, and are responsible for

their contents."  *In re Rapp*, 2009 Bankr. LEXIS 4287, *19-20 n.12 (Bankr. C.D. Cal. July 31,

---

[10] Cases interpreting          also hold that "claims are to be valued at the petition date."
*In re Fed.-Mogul Global Inc.*, 330 B.R. 133, 155 (Bankr. D. Del. 2005) (estimating asbestos-
related claims as of petition date); *see also In re Brints Cotton Marketing, Inc.*, 737 F.2d 1338,
1342 (5th Cir. 1984) (use of petition date reinforces "broad equitable principle that creditors
should not be disadvantaged vis-à-vis one another by legal delays attributable solely to the time-
consuming procedures inherent in the administration of the bankruptcy laws") (quoting *Nicholas
v. United States*, 384 U.S. 678, 683 (1966)); *see also Sexton v. Dreyfus*, 219 U.S. 339, 344 (1911)
(upholding fixing of creditor's rights as of the date of filing of the bankruptcy petition, noting the
historical fiction that such date "simply fixes the moment when the affairs of the bankrupt are
supposed to be wound up," as if "the whole matter could be settled in a day").

1   2009) (P. Carroll, B.J.) (citations omitted); *In re Rolland*, 317 B.R. 402, 414 (Bankr. C.D. Cal.

2   2004) (P. Carroll, B.J.) (same).

3          As judicial admissions, the amounts listed above cannot be denied or controverted by the

4   Debtor – either at the Bankruptcy Court level or later on appeal. *See*, *e.g.*, *United States v.*

5   *Bentson*, 947 F.2d 1353, 1356 (9th Cir. 1991) ("judicial admission is binding before both the trial

6   and appellate courts") (citing *Am. Title Ins. Co. v. Lacelaw Corp.*, 861 F.2d 224, 226 (9th Cir.

7   1988)).

8          Because the Debtor cannot pay off the Section 2000 Claim in full, the inquiry may end

9   here, and the Plan must be modified or vacated to account for this claim.  The Alternative Plan

10  provides a workable solution to the problem.

11         **E.      Valuing the Attorney Fee Claim**

12         It is law of the case that the Attorney Fee Claim is not limited to the amount of the Bond.

13  The District Court explained the possible scenarios under Section 2000(c) in this way:

14              If the majority shareholders ultimately opt not to purchase the minority's
15         shares, they are liable for the minority shareholders' expenses, including
           attorney's fees. To effectuate the payment for expenses and fees, the court enters
16         judgment against the majority shareholders as well as against the surety on the
           bond. [Cal. Corp. Code] § 2000(c).  If the award is no greater than the amount of
17         the bond, then the minority shareholders can—if they so choose—obtain payment
           entirely from the bond surety.  In any event, but particularly if the award exceeds
18         the bond amount, the minority shareholders can attempt to recover some or all of
           the award directly from the majority shareholders through the judgment against
19         them.

20

21  [RJN, Ex. I at 12.]  Therefore, the amount of the Attorney Fee Claim is simply the actual amount

22  of fees and expenses testified to in the Miller Supplemental Declaration, or approximately

23  **$916,000**.  Everything is detailed in the fee and expenses statement attached to the Miller

24  Supplemental Declaration, and the Minority believes that, given the circumstances in the Superior

25  Court Action, the fees are fair and reasonable.  In any event, however, neither Section 2000 nor

26  the Judgment limit the Attorney Fee Claim to a "reasonableness" standard.  [*See* Cal. Corp. Code

27  § 2000(c) ("If the purchasing parties do not make payment for the shares within the time

28  specified, judgment shall be entered against them and the surety or sureties on the bond **for the**

**amount of the expenses (including attorneys' fees)** of the moving parties") (emphasis added); *see also* RJN, Ex. A, ¶ 6 ("judgment shall be entered against OCN and its surety or sureties for **all expenses and attorneys' fees incurred by plaintiffs in connection with OCN's election on June 26, 2007 to purchase the Shares pursuant to Corporations Code § 2000, according to proof**") (emphasis added)]. As such, the Miller Supplemental Declaration requires allowance of the claim against the Debtor and the Bond in the amount of approximately $916,000.

### F. The Mandate Rule and Law of the Case Doctrine Necessitate a Tailored Approach to Addressing the Deficiencies in the Plan

Applying the principles of the mandate rule and law of the case doctrine here, the scope of the remand as it pertains to the Classes of creditors under the Plan is as follows. First, the doctrine of substantial consummation can have no applicability here, where the Stay Order stayed the effectiveness of the confirmation of the Plan as to classes below Class 4 unsecured creditors. Therefore, notwithstanding passage of the Effective Date as to classes 4 and above, the transactions contemplated under the Plan as to classes 5B and 7 (which are the only Classes affected by the scope of the appeal) were necessarily held in abeyance. Likewise, the binding effect of the Plan under Section 11.3 of the Plan can have no operative effect as to Classes 5B and 7, each of which were included within the ambit of the Stay Order. As to them, the "slate has been wiped clean" and it is as if no plan had been confirmed. *Western Real Estate Fund, Inc.*, 109 B.R. at 466. As such, although the transactions under the Plan as to Classes 4 and above have been consummated, that fact now presents no debility to the modification of the Plan as to Classes 5B and 7, as required to bring it into accord with the District Court Order.

Moreover, the amendments that are now required to be made to the Debtor's Plan as a result of the District Court Order are consistent with the expectations of creditors under the existing Plan. To the contrary, the required amendments are very specific and limited in their effect solely to Classes 5B and Class 7. A summary follows:

### 1. Classes 4 and Above, 5A and 6 (Not Impacted)

As noted above, the District Court Order did not affect Classes 4, 5A and 6 because none of those Classes were party to any appeal nor was treatment of any of those Classes the subject of

1    any appeal.  Therefore, those Classes and the Plan's treatment of those Classes are outside the

2    scope of the mandate of the District Court Order and cannot be altered by any proposed

3    modifications or amendments to the Debtor's Plan.

4    Additionally, Classes 4 and above were not subject to any stay pending the Minority's

5    appeal.  As such, the Plan as it relates to Classes 4 and above has become effective and may not

6    now be altered as to these Classes.  With respect to Classes 5A and 6, notwithstanding the stay

7    pending appeal imposed by the District Court, for the reasons stated above, the Plan may not be

8    altered as to those Classes as well.

9    ## 2.    Class 5B (Directly Impacted)

10   Next in priority is Class 5B, which includes both the Minority's Attorney Fee Claim and

11   their Section 2000 Claim.  As discussed further below, the Plan **must** be modified as to the

12   treatment of Class 5B to bring the Plan into compliance with the District Court Order and with the

13   requirements of the Bankruptcy Code and to eliminate the present inconsistencies in the Plan with

14   respect to the proper treatment of Class 5B as a claim.  Although the required amendments to the

15   Plan directly impact the Minority, to the extent the Court would confirm the Minority's proposed

16   Alternative Plan, the Minority (as the proponent) is deemed to accept the Alternative Plan.

17   Moreover, as noted by the court in *Western Real Estate Fund*, upon the entry of the

18   District Court Order, the *status quo ante* applies with respect to the Minority's Class 5B Claims.

19   That is, as to the Minority, it is as though there had been no disclosure, no confirmation hearing,

20   and no confirmation of the Plan.  The "slate is wiped clean" as to the Minority's position vis-à-vis

21   the Debtor's Plan, which is not confirmed as to the Minority and does not bind the Minority as to

22   the treatment of its Claims or otherwise.  *See* 109 B.R. at 461-63.

23   ## 3.    Class 7 (Directly Impacted, but Deemed to Reject)

24   Finally, last in priority under the Plan is Class 7, which consists of all Equity Interests in

25   OCN.  The treatment of Class 7 under the Plan was directly at issue on appeal of the

26   Confirmation Order.  The Plan must be modified as to Class 7, because the Plan presently allows

27   Equity Interests to "remain after the Effective Date," or permits them to be cancelled in exchange

28   for the receipt by their holders of value under the Plan.  As discussed further below, Class 7

Equity Interests must be eliminated and may otherwise receive no property under the Plan, where the Plan does not provide any mechanism at all for the payment in full of the Class 5B Section 2000 Claim of the Minority, which has priority over Class 7. Although Class 7 will be affected by the amendments to the Plan required by the District Court Order, the members of Class 7 are deemed to reject these amendments.

**G.      Changes to the Plan's Treatment of Classes 5B and 7 Are Mandated by the Bankruptcy Code, the District Court Order, and the Plan Itself**

Moving on to the specific flaws in the Plan as currently drafted, the Plan has been rendered non-compliant with sections 1122, 1123 and 1129 of the Bankruptcy Code as a result of the District Court's reversal of the Claim Determination Order, its reversal of the Attorney Fee Order, and its reversal and remand of the Confirmation Order. The following summarizes the general changes that must be made to the Plan in order to bring it into harmony with the District Court Order:

**1.      All Old Equity Must Be Eliminated, Where the Present Value of the Section 2000 Claim Is Not Paid in Full**

First of all, the Plan must be amended to provide for the elimination of all the currently existing Equity Interests upon the Plan Effective Date. This is because the absolute priority rule "precludes the bankruptcy court from approving a plan that gives the holder of a claim anything at all unless all objecting classes senior to him have been paid in full." *Perez*, *supra*, 30 F.3d at 1214. Furthermore, "because claims of equity holders are always junior to claims of creditors . . . a bankruptcy court may not approve a plan that gives the debtor any interest in the reorganized estate unless the plan provides for the full payment of claims of creditors in the objecting class." *Id.* In *Perez*, the Ninth Circuit observed that where the debtor's prior shareholder retained control of the business and continued to operate the business, the appellant creditor was "entitled to one hundred cents on the dollar." *Id.*; *see also In re Tharp Ice Cream Co., Inc.*, 25 F. Supp. 417, 418 (E.D. Pa. 1938) (under Bankruptcy Act, denying confirmation of plan as not fair and equitable where existing preferred stockholders retained shares of preferred stock, which were also given to creditors in satisfaction of their claims).

1    Here, to the extent Class 7 retains any property under the Plan, the Minority is entitled to

2  receive one hundred cents on the dollar as to their Section 2000 Claim.  The Debtor's Plan,

3  however, does not provide the Minority even 1 cent on the dollar on the Section 2000 Claim—

4  even under the happening of the contingency that the Claim Determination Order is reversed.

5  This is notwithstanding the fact that, as noted above, at the hearing on the Debtor's Disclosure

6  Statement, the Court made it an express condition for approval of the Debtor's Disclosure

7  Statement that the Plan provide as a contingency if the Claim Determination Order was reversed

8  that equity would receive nothing under the Plan unless the full amount of the Minority's claim

9  was paid under the Plan.

10    In light of this, pursuant to 11 U.S.C. § 1129(b)(2)(B), Section 7.6 of the Plan must be

11  amended to expressly provide that all equity shares of the Debtor under the Plan be eliminated

12  where the Debtor has not otherwise committed under the Plan to pay in full the present value of

13  the Minority's Section 2000 Claim in Class 5B.

14    **2.    New Voting Shares and Control of OCN Must Be Ceded to Those Persons Holding a True Economic Interest in OCN**

15    The District Court's determination that the Section 2000 Claim was a claim and not equity

16  wrought a sea-change in this bankruptcy case, and the defects in the Plan cannot be resolved by

17  the Debtor remaining in control under a so-called "liquidating plan."  The District Court Order

18  and California corporate law mandate that only those with an economic stake in the company may

19  have control and standing to manage and operate the company.  The Minority, by virtue of the

20  Section 2000 Claim and the Absolute Priority Rule, are the true economic stakeholders here and

21  are entitled to receive the newly issued voting shares of the Reorganized Debtor in satisfaction of

22  their claim.

23    A plan cannot be confirmed where, as here, existing shareholders having no equity retain

24  either management or control of the company.  In such a case "full voting control of the

25  corporation" must be ceded to a senior class. *Tharp Ice Cream*, *supra*, 25 F. Supp. at 418 ("We

26  think that fair dealing and equity demand in a situation where stockholders are asking to retain a

27  position which is not supported by a present interest in the debtor's assets, that full voting control

28

1    of the corporation be given to the creditors").  In such a case, new equity shares with the power to

2    vote to elect the directors of the company must be issued, in order to maintain the proper

3    corporate governance.  As has been noted by a much-cited commentator on the subject, the

4    premise of the absolute priority rule has a direct bearing upon the allocation of voting power in

5    the reorganized company where there is insufficient value in the debtor to permit senior interests

6    to be satisfied.  Therefore, the absolute priority rule generally requires that unsatisfied senior

7    interests should be given whatever legal and economic values arise out of possession of voting

8    power and the right to select management.  M. Krotinger, *Management And Allocation Of Voting*

9    *Power In Corporate Reorganizations*, 41 COLUM. L. REV. 646, 667 (1941).

10    In addition to the requirements of the absolute priority rule, where existing equity has

11    been eliminated under a plan, the issuance of new shares to accomplish the transfer of control of

12    the entity to those persons having a true economic interest in the debtor is also required by 11

13    U.S.C. §§ 1123(a)(6) and (7).  Under Sections 1123(a)(6) and (7), a plan, to be confirmed, must

14    provide for a corporate structure of the reorganized debtor that is in compliance with the legal and

15    regulatory environment in which all other corporations must operate, including the corporate laws

16    of the state of incorporation of the debtor.  Applicable here, under the corporate laws of

17    California, there must always be at least one shareholder class having the power to elect and

18    remove directors.  *See* Cal. Corp. Code Section 400(a).  Moreover, the shareholders empowered

19    to vote for the directors must be comprised of those persons having a vested economic interest in

20    the reorganized entity.

21    The interdependencies between the California statutes and Section 1123 of the Bankruptcy

22    Code are discussed at some length in *In re Mahoney*, 80 B.R. 197 (Bankr. S.D. Cal. 1987).  In

23    *Mahoney*, the debtor's plan provided that the debtor's unsecured creditors would become the new

24    corporate shareholders of the debtor as satisfaction of their claims.  The plan, however, without

25    creating separate classes of stock, restricted the rights of certain shareholders to vote for all

26    directors.  The bankruptcy court held that this was a violation of Cal. Corp. Code § 708, which

27    requires cumulative voting.  Likewise, the debtor's plan proposed to install the debtor as a

28    director for five years, with no right of the shareholders to vote on this election.  The bankruptcy

1   court held that this "self appointment" by the debtor did not comply with the provisions of the

2   Cal. Corp. Code § 301(a), which required all directors to be elected by the shareholders of the

3   company at an annual shareholder meeting. The Court found that each of sections 708 and 301(a)

4   exhibited California's concern that corporations must act democratically, which the debtor's plan

5   did not uphold. *See id.* at 200-01. The bankruptcy court thus refused to confirm the plan, holding

6   that California law and 11 U.S.C. § 1123 required that the plan must provide the true stakeholders

7   in the company with the power to elect the directors of the company.

8       Here, the Debtor's current Plan similarly offends California law and Bankruptcy Code §

9   1123. In fact, the Debtor's Plan is far worse than the plan that was rejected by the court in

10  *Mahoney*. Here, the Debtor's Plan does not pay the Minority the present value of its Section 2000

11  Claim, and otherwise offers them no value under the Plan in lieu. Moreover, the Plan allows the

12  existing Equity Interests to maintain their shares and the control of the company, even though the

13  absolute priority rule requires them to be divested of their interests under the Plan. Likewise, the

14  Debtor's Plan also permits these same existing shareholders—who can retain no interest in

15  OCN—to continue to elect and remove directors. In order for the Plan to be brought into

16  conformity with the Bankruptcy Code and California law, the interests of these old shareholders

17  must be eliminated. New equity must be issued to parties holding a true economic interest in the

18  reorganized Debtor. In this respect, the Minority is willing, by agreement, to exchange its right to

19  receive payment on its Section 2000 Claim for the transfer to it of 100 percent of the newly issued

20  shares in OCN, representing 100 percent of the equity ownership of OCN.

21      Moreover, where old equity is eliminated, the debtor's current management must also

22  cede actual control of the company to the new equity owners, because there is no other way to

23  adequately protect the interests of the creditors receiving equity in exchange for their claims other

24  than by giving them actual control over the business on which they would depend for repayment

25  of their claim. *See In re Ahead Communications Systems*, 395 B.R. 512, 518 (D. Conn. 2008)

26  (noting that the purpose of 11 U.S.C. § 1123(a)(6), is to ensure that the voting power "properly

27  recognizes the respective position of the claimants and stockholders according to their rank and

28  the rights they surrender.") (quoting 7 COLLIER ON BANKRUPTCY ¶ 1123.01)). Under the

1  proposed amendments to the Plan, the Minority will depend solely upon OCN's operations and

2  the liquidation proceeds for repayment of its Section 2000 Claim.  Under these circumstances,

3  and where the existing Equity Interests are required to be eliminated under the Plan, 11 U.S.C. §§

4  1123(a)(6) and (7) and California corporate statutes mandate that the Minority must also be

5  vested with the voting power to elect the directors of OCN in order to ensure that the Minority's

6  interests are adequately protected.

7       To the extent the Debtor is liquidated, therefore, the liquidation must be conducted by

8  those with a vested economic interest and standing to do so.  In this case, by virtue of the District

9  Court's determination that the Section 2000 Claim is a claim, that is the Minority.

10 **IV.    CONCLUSION**

11      The Minority asks that the Court enforce and implement the District Court Order, as it is

12 obligated to do under the mandate rule and the law of the case doctrine, by granting the Motion

13 and compelling the Debtor to immediately modify the Plan, pursuant to sections 105 and 1127 of

14 the Bankruptcy Code, in a way that provides equitable treatment for the Minority's Class 5B

15 claim.  Such modifications would only affect Class 5B and Class 7 and would not prejudice the

16 rights of any other creditors.  In the alternative, however, to the extent the Debtor is unwilling or

17 believes it is unable to execute its duties to the estate in this respect, the Minority requests that the

18 Court would instead vacate the Confirmation Order, in part, and proceed to confirm the

19 Minority's Alternative Plan, without the necessity for further or additional disclosure or

20 solicitation of acceptances.  The Minority further requests that, pursuant to the District Court

21 Order, this Court would vacate the Claim Determination Order and the Attorney Fee Order and

22 grant further relief as the Court deems just and proper.

23

24

25

26

27

28

1

Respectfully submitted,

2

Dated: May 8, 2012

3

COOLEY LLP

4

5

By: _____/s/ Ali M.M. Mojdehi_____

6

Ali M. M. Mojdehi (123846)
Janet D. Gertz (231172)
Brian W. Byun (264506)

7

8

Attorneys for Creditor
The Minority Voting Trust, David F. Veyna,
Carmen Veyna, and Anna M. Zankel, Trustees

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28